<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| POLARIS CAPITAL, LLC : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> PIETER J. GASPERSZ, : <br> SABRINA GENNARINO, : <br> GIRL'S GOTTA EAT : <br> ENTERTAINMENT, LLC, and : <br> GGEE PRODUCTIONS LOUISIANA, : <br> LLC, : <br> : <br> Defendants. : | Civil Action No. 12-3805 (KM) <br><br><br> REPORT AND RECOMMENDATION |

**I.   INTRODUCTION**

This matter comes before the Court on the motion of Defendants Pieter J. Gaspersz, Sabrina Gennarino, Girl's Gotta Eat Entertainment, LLC, and GGEE Productions Louisiana, LLC (collectively "GGEE" or "Defendants") to dismiss or stay this matter and compel arbitration.[1] The motion stems from Plaintiff Polaris Capital LLC's ("Polaris" or "Plaintiff") Complaint setting forth a number of causes of action based generally on a failed business venture between the parties, but specifically on Defendants having failed to repay a $94,000 loan as required by contract. The Honorable Kevin McNulty, United States District Judge, referred the motion to this Court for Report and Recommendation. Pursuant to Federal Rule of Civil

---

[1]Although styled as a motion to dismiss, Defendants make no arguments that the case should be dismissed for any reason other than to compel arbitration.

1

Procedure 78, the Undersigned did not hear oral argument. For the reasons set forth below, the Court recommends that Defendants' motion to stay this matter and compel arbitration be granted.

## II. BACKGROUND

The only question before the Court is whether the scope of an arbitration clause in the parties' agreement is broad enough to encompass Plaintiff's claims. A brief recitation of the Complaint's allegations and relevant provisions of the agreement are provided as background for the parties' contract and their disputes.

Defendants approached Polaris in July 2011 to secure funding for two "independent films" entitled "Perico" and "Running Scared." Compl. at ¶ 11. In December, Polaris agreed to provide funding for these films in two stages, and the parties executed a Financing Agreement (the "Agreement") in connection with their arrangement.[2] The Agreement provided that Polaris initially would provide Defendants with a $94,000 interest-bearing loan for a 90-day term. Those funds were disbursed in December 2011 and were to be repaid by March 2012. *Id.* at ¶ 14; Agreement at #1. The interest rate for the loan was contingent upon when Defendants repaid the loan—the later Defendants repaid the loan, the higher the interest rate, with rates ranging from 2% to 10%. Agreement at #3. Plaintiffs alleges that Defendants were to use this initial amount for start-up costs and to secure additional funding. Compl. at ¶ 14; Agreement at #2. If the Defendants were successful in these aims, the Agreement contemplated Polaris providing an additional $1.2 million in funding. Compl. at ¶ 15; Agreement at #2.

---

[2] The Court has reviewed the Agreement in its entirety, which was attached as an exhibit to Plaintiff's Complaint (ECF No. 1) and also as Exhibit A to Defendants' Motion (ECF No. 7-2). It sets out the basic structure of the financing for Defendants' films and appears to contemplate a subsequent, more thorough agreement.

Plaintiff alleges that within weeks of execution of the Agreement and provision of the initial $94,000, it became suspicious of the deal. When Defendants expressed their difficulty in securing full funding, Polaris began to question the veracity of Defendants' representations. Compl. at ¶¶ 18-20. Plaintiff alleges that Defendants attempted to convince Polaris that they had secured financial backing through a secret lender that was represented by a third party, Tonson Technologies, LLC ("Tonson"). *Id.* at ¶ 18. Defendants asked Polaris to post $1 million in an escrow account controlled by Tonson in order to obtain a standby letter of credit ("SBLC"), which would then secure a non-recourse loan from the secret party to fund all remaining funds for the films. *Id.* at ¶¶ 19, 20. Distrustful of Defendants, Polaris refused to provide any further funds. Shortly thereafter, Defendants failed to repay the initial loan. *Id.* at ¶ 21.

On April 12, 2012, Polaris terminated the Agreement. *Id.* at ¶ 23. On May 4, 2012, Polaris filed an action in the Superior Court of New Jersey Law Division of Bergen County alleging: (1) fraud; (2) violations of federal and New Jersey securities laws; (3) breach of contract; (4) fraudulent inducement; (5) unjust enrichment; (6) conversion and theft; (7) breach of fiduciary duty; and (8) civil conspiracy. The Complaint was served on Defendants on May 30, 2012, and they removed this action to federal court based on diversity jurisdiction. Notice of Removal at ¶ 15 (ECF No. 1).

The Agreement contained an arbitration clause. Neither party disputes that it entered into a valid agreement, and that the agreement contained the following arbitration clause:

> Any controversy or claim arising out of or relating to this agreement or any breach thereof shall be settled by arbitration in accordance with the Rules of the American Arbitration Association; and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Agreement # 12. Instead, the parties disagree on the scope of that clause. Plaintiff contends that it the arbitration clause encompasses only the breach-of-contract claim, and does not include the remaining claims in the Complaint. Defendants contend that the arbitration clause requires arbitration of all claims in the Complaint.

### III. DISCUSSION

The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), directs federal courts to compel arbitration of claims "arising out of" a valid agreement to arbitrate. 9 U.S.C. § 2. The FAA reflects "the national policy favoring arbitration agreements." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). Thus a motion to compel arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986); *AT & T Mobility LLC v. Concepcion*, -- US --, 131 S. Ct. 1740, 1749 (2011) ("[C]ourts must place arbitration agreements on equal footing with other contracts and enforce them according to their terms."); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."). There is a two-step test to determine whether an arbitration clause is applicable: (1) whether a valid arbitration clause exists; and (2) whether the particular dispute falls within the scope of the arbitration agreement. *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).

Polaris does not argue that the Agreement is unconscionable or that the clause is invalid. Pl. Opp. at 2. Rather, it takes issue only with whether all of its claims are subject to the

arbitration agreement.[3]  *Id.*  Polaris contends that the arbitration agreement encompasses only its claim for breach of contract.  *Id.* at 1-5.  The core tenet of Polaris's argument is that its allegations sound in fraud, and that other than its breach-of-contract count, its claims are only tangentially related to the Agreement itself.  Specifically, Polaris argues that the Agreement is only a small part of its relationship with Defendants, and that the Complaint alleges a host of fraudulent conduct starting with the initial negotiations and culminating with Defendants' efforts to secure additional funding through a purportedly sham SBLC.  Polaris further argues that any ambiguity in the agreement must be construed against defendants as authors of the agreement.  *Id.* at 5.

But Polaris's argument ignores the breadth of the arbitration clause at issue and the import of the Agreement to Polaris's own allegations.  The arbitration clause encompasses ***any controversy or claim*** (1) arising out of or relating to the agreement or (2) any breach thereof.  The Third Circuit has held that similar phrases such as "arising under" and "arising out of" are normally given broad construction.  *Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000).  This broad construction applies because the federal policy in favor of arbitration is "particularly applicable" where the arbitration clause at issue is broad.  *Id.* at 725.  Considering the strong federal policy favoring arbitration, provisions such as the present one must be "generously construed" in favor of coverage.  *Mitsubishi Motors Corp. v. Soler Chrylser-Plymouth, Inc.*, 473 U.S. 614, 625 (1985); *AT & T Technologies*, 475 U.S. at 650 ("Doubts should be resolved in favor of coverage").

---

[3] Polaris concedes that its breach-of-contract claim must proceed to arbitration.  Pl. Opp. at 1.

In this case, the alleged fraud culminated in the Agreement and it is through the breach of the Agreement (*i.e.*, Defendants' failure to repay the loan) that Polaris claims it was financially harmed. A contract's arbitration clause can cover allegations of fraud related to the contract or other disputes relating to the formation of the agreement. *Battaglia*, 233 F.3d at 724-25 (stating that a broad arbitration clause encompasses disputes relating to formation of an agreement); *FCMA, LLC v. Fujifilm Recording Media U.S.A., Inc.*, 2010 U.S. Dist. LEXIS 79129, at *15-17 (D.N.J. Aug. 5, 2010) (finding that fraud and conspiracy claims were "based on allegations that Defendants fraudulently induced it to enter the Distributorship Agreement," shared "common core of operative facts and arguments," and "all of the claims are within the scope of the arbitration provision"); *Shapiro v. Baker & Taylor, Inc.*, 2009 U.S. Dist. LEXIS 48187, *41 (D.N.J. June 9, 2009) ("The derivative nature of this claim brings it within the arbitration provision's scope.").

Polaris's causes of action all share a common core of facts and arguments based on allegations of Defendants fraudulently inducing Polaris into a phony investment scheme, in particular the Agreement and Polaris's payment of $94,000 to Defendants. A review of the Complaint shows that each of Polaris's claims is explicitly and substantially related to the parties' Agreement or the alleged breach of that Agreement.

> A. **Polaris's Claims For Fraud (Count One) and Fraudulent Inducement (Count Four)**

The entirety of Polaris's fraud claim is based on the Agreement and allegations that Defendant fraudulently induced Polaris into a scam. The Complaint alleges in pertinent part:

> Defendants constructed the Agreement and shopped it to Polaris with full knowledge they would not repay or attempt to repay any loan proceeds obtained

> from the scam. Defendants' promises under the Agreement are riddled with material misstatements, including the false and deceptive assertion that they entered into the Agreement with multiple alternatives to secure full financing, and that Polaris's funds would be protected and/or guaranteed by additional collateral for the duration of the financing.

Compl. at ¶26. Moreover, the harm Polaris alleges flows from its reliance on those representations: "Polaris acted in reasonable reliance on Defendants' representations throughout its course of dealings with Defendants, both in entering into the Agreement and in reviewing the subsequent SBLC deal with Defendants and Tonson." *Id.* at ¶ 27. Similarly, the entirety of Polaris's fraudulent inducement allegation relates to the Agreement generally. "Defendants fraudulently induced Polaris to enter in the Agreement." *Id.* at ¶ 35. If Polaris had alleged with requisite specificity that Defendants fraudulently induced Polaris into the arbitration clause itself—and nothing from the face of the Complaint or the parties' briefing suggests such an allegation—then such a claim would properly be before the Court. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404 (1967) ("Accordingly, if the claim is fraud in the inducement of the arbitration clause itself...the federal court may proceed to adjudicate it."). But a general allegation of fraudulent inducement is properly made before the arbitrator. *Id.*; *RCM Techs., Inc. v. Constr. Servs. Assocs.*, 149 F. Supp. 2d 109, 113 (D.N.J. 2001) ("The Supreme Court has held that if there is no claim that fraud was directed at the arbitration clause itself, claims of fraudulent inducement are arbitrable."). The Court must therefore conclude that these claims arise out of the contract and the alleged breach and are within the scope of the arbitration clause.

    **B.**  <u>**Securities Law Violation (Count Two)**</u>

Polaris next alleges that "Defendants violated [federal and state securities laws] by and

through their deceptive scheme to induce Polaris's loan and their *intention not to repay the loans, or otherwise comply with the terms of the Agreement*. Had Defendants not made false and misleading representations to Polaris in the Agreement as well as thereafter, Polaris would not have entered into the initial loan agreement. . . ." Compl. at ¶ 30 (emphasis added). While a securities violation is not generally the type of claim one would consider to arise from the breach of a contract, the purpose of this contract was to provide investment capital. And the violations here, if any, of securities law are made actionable through the alleged misrepresentations Defendants made in the Agreement. Thus, they are within the scope of the arbitration provision.

        C.     **Polaris's Claims For Unjust Enrichment (Count Five) and Conversion and Theft (Count Six)**

Similarly, Polaris's unjust enrichment and conversion and theft claim are based entirely on the Agreement and the Defendants' failure to repay the $94,000 loan: "Defendants have been unjustly enriched as a result of their fraud against Polaris, having retained and enjoyed the use of Polaris's $94,000 loan." Compl. at ¶ 37. "As a result, Defendants are liable to Polaris for conversion and theft of the principal and interest on Polaris's December 2011 loan." Compl. at ¶ 39. Securing repayment of this loan was the primary purpose of the contract and Defendants' alleged failure to do so (which also is the premise of plaintiff's breach-of-contract claim) gives rise to these claims.

        D.     **Polaris's Claims For Breach of Fiduciary Duty (Count Seven) and Civil Conspiracy (Count Eight)**

Finally, Polaris's remaining claims for breach of fiduciary duty and civil conspiracy involve the formation of the Agreement and any responsibilities flowing from it. "Defendants have breached their fiduciary duties of loyalty, good faith and fair dealing, and care to Polaris in

misrepresenting the true nature and purpose of the Agreement...." Compl. at ¶ 41. "Defendants have, by their actions, knowingly conspired amongst themselves to defraud Polaris of over $1.3 million dollars, consisting of the actual $94,000 loan they obtained as well as the additional $1.2 million they south under the Agreement, plus interest and costs." Compl. at ¶ 44.  These are controversies arising from the formation of the Agreement and are clearly within the scope of the arbitration clause.

In support of its argument for limited application of the arbitration clause, Polaris cites to a number of New Jersey state law opinions construing arbitration agreements, mostly in the context of employment law.  There can be no question, however, that it is federal law—not state law—that controls the Court's inquiry:

> Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary.  The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act...The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (internal citations omitted); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk GmbH*, 585 F.2d 39, 43 (3d Cir. Pa. 1978) ("However, whether a particular dispute is within the class of those disputes governed by the arbitration and choice of law clause is a matter of federal law."). Even if Polaris's state law cases were apposite, they appear unavailing.  Those cases are in the dissimilar context of employment contracts and do not apply by analogy to the matter here.  The one federal case that Polaris cites is *Optopics Labs. Corp. v. Nicholas*, 947 F. Supp. 817 (D.N.J.

1996), where the court stayed a fraud claim pending arbitration of breach-of-contract and indemnification claims. The arbitration clause at issue in that case, however, applied only to disputes arising out of any dispute relating to an indemnification provision and contract disputes flowing from that provision. *Id.* at 822. And the court could not determine with certainty whether the fraud claim was encompassed within the arbitration provision, but because that claim was entirely subsumed by the arbitrable issues, the Court stayed the fraud count pending resolution of the underlying issues. *Id.* at 824 ("Since the complaint seems to have been drafted more to avoid arbitration than to elucidate a theory of fraud, the Court cannot with certainty determine whether the scope of this claim exceeds that which the parties agreed was arbitrable."). The arbitration clause at issue in this case is broader than the arbitration clause at issue in *Optopics,* and there is little question that Polaris's disputes all are related to the Agreement or its breach. Moreover, were there any doubt, it must be resolved in favor of arbitration. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1755 (2011). In light of the above reasoning, the Undersigned concludes that Plaintiff's claims should be subject to the arbitration clause.

Polaris also argues that if the Court does compel arbitration, it must compel that arbitration to occur in New Jersey. On that point, Polaris is correct. The Federal Arbitration Act grants a district court power to compel arbitration only "within the district in which the petition for an order direction such arbitration is filed." 9 U.S.C. § 4; *see also Econo-Car International v. Antilles Car Rentals*, 499 F.2d 1391, 1394 (3d Cir. 1974); *Alpert v. Alphagraphics Franchising*, 731 F. Supp. 685, 689 (D.N.J. 1990). There is no forum selection clause or any other indication of where the parties intended to arbitrate. Therefore, the Court must recommend that the arbitration be compelled to occur in New Jersey and that the case be stayed until the arbitration is

complete. *See Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) ("[T]he plain language of [9 U.S.C.] § 3 . . . clearly states, without exception, that whenever suit is brought on an arbitrable claim, the Court 'shall' upon application stay the litigation until arbitration has been concluded.").

### IV.  CONCLUSION

For the reasons stated above, the Undersigned respectfully recommends that the District Court grant Defendants' motion to stay and compel arbitration, and that arbitration of all of Plaintiff's claims be compelled to occur in New Jersey.

The parties have fourteen days to file and serve objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 7.1(c)(2).

s/*Michael A. Hammer*
**UNITED STATES MAGISTRATE JUDGE**

Date: October 1, 2012